## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN THOMAS WOLFENDEN III,<br><br>       Plaintiff,<br><br>v.<br><br>ACOUSTIC, L.P. and<br>INTERNATIONAL BUSINESS<br>MACHINES CORPORATION,<br><br>       Defendant. | **COMPLAINT**<br><br>Jury Trial Demanded |

Plaintiff John Thomas Wolfenden III ("Mr. Wolfenden" or "Plaintiff"), complaining of the acts of Acoustic, L.P. ("Acoustic") and International Business Machines Corporation ("IBM"), alleges and states the following:

## **INTRODUCTION**

1.       Mr. Wolfenden, a highly skilled software sales representative, closed a deal with the multi-national retailer TJX Companies, Inc. on January 31, 2020 worth millions of dollars to Acoustic (the "Software Deal").

2.       By the commission formula given to Mr. Wolfenden, he was owed $820,714 for his work closing the Software Deal.

3.       Acoustic was paid on the Software Deal. Mr. Wolfenden was not.

4.       Instead of paying Mr. Wolfenden the commission he earned on the Software Deal, Acoustic fired him less than two weeks later. The only justification provided to Mr. Wolfenden for his termination was an allegation that certain of Mr.

Wolfenden's business and travel expenses from six months before to over a year before were "out of compliance."

5.      The truth is that there was little, if anything, to complain about with Mr. Wolfenden's year-old travel expenses. It is uncontested that any perceived or alleged issues related to Wolfenden's previous travel expenses had no relation to the large Software Deal Mr. Wolfenden successfully closed or the commission Mr. Wolfenden was owed resulting from that deal.

6.      Mr. Wolfenden closed his deal on January 31, 2020. He was terminated on February 11, 2020.

7.      As a result, Acoustic kept all $820,714 of the commission owed to Mr. Wolfenden.

8.      Acoustic has since blamed IBM for the decision to terminate Mr. Wolfenden and refuse him the commission that he had earned. Yet, Acoustic still has Mr. Wolfenden's money, all $820,714 of his commission.

9.      Mr. Wolfenden's commissions were clearly earned and due under Connecticut law. Acoustic and IBM's conduct using an otherwise legitimate expense review as pretext to keep over $800,000 of earned commissions is reprehensible. This suit seeks to recover those commissions, along with interest, attorneys' fees, and liquidated and punitive damages.

## PARTIES

10.     John Wolfenden is a citizen and resident of Branford, Connecticut. Mr. Wolfenden worked as an Acoustic sales representative from approximately July 2019 until February 2020.

11.     Acoustic is a limited partnership organized under the laws of Delaware, with its principal place of business in New York, New York.

12.     IBM was incorporated, and is existing, under the laws of the State of New York. IBM's principal place of business is in the State of New York.

13.     Acoustic and/or IBM employed Plaintiff and other employees performing sales work for them in Connecticut and New York.

## JURISDICTION AND VENUE

14.     Subject matter jurisdiction over this matter is conferred upon and vested in this Court under 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

15.     This Court has personal jurisdiction over Acoustic because its principal place of business is in the Southern District of New York.

16.     This Court has personal jurisdiction over IBM because its principal place of business is in the Southern District of New York.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial portion of the acts and conduct giving rise to the claims occurred within the District.

## FACTS

18.     In June 2019, International Business Machines Corporation ("IBM") divested itself of a portfolio of assets.

19.     The assets were sold to private equity firm Centerbridge Partners, L.P. ("Centerbridge") and included intellectual property and related contracts with customers for the use of certain technology that was divested.

20.     Centerbridge repackaged these assets into a new company, Acoustic, and hired many former IBM employees that had worked with relevant technology and customers to work for Acoustic.[1]

21.     Acoustic's primary focus is on providing marketers with intuitive, artificial intelligence-powered technology solutions that are purpose-built for that industry.

22.     Acoustic serves an international client base of more than 3,500 brands, including Fortune 500 companies, and provides digital marketing, marketing analytics, content management, personalization, mobile marketing, and marketing automation solutions.

23.     The terms of Centerbridge's purchase of IBM's assets that resulted in the creation of Acoustic provided that IBM would continue to provide support for

---

[1] Acoustic has claimed that Plaintiff was an employee of IBM even after the divestiture and creation of Acoustic. Yet, Plaintiff sold Acoustic products for Acoustic's benefit, was not a contractor or outside sales representative to Acoustic, and his Software Deal commissions were ultimately retained by Acoustic. Nevertheless, both Acoustic and IBM meet the definition of an "employer" under Connecticut law and, as set out below, both Defendants are liable to Plaintiff as his employer.

Acoustic's employees from a human resources perspective. This support included, among other things, processing the payroll for Acoustic, allowing Acoustic to utilize IBM's standard forms, policies, and procedures, including IBM's education materials for commissions, with respect to its employees, and managing Acoustic's employee benefit offerings.

24.     This support was due to continue until sometime in early 2020.

25.     One such form that Acoustic elected to utilize for its sales representatives was a document titled an Incentive Plan Letter ("IPL"). This document includes, among other things, the representative's quota and assigned accounts (referred to as his territory) for a given sales period, and a series of boilerplate disclaimers. Consistent with the practice at IBM, sales periods at Acoustic were defined as six-month periods, each representing half a year and referred to as the 1H (first half) and 2H (second half).

## Many Courts Have Recently Ruled for Plaintiffs in Similar Cases Involving IBM's IPLs

26.     For over 15 years, many salespeople at IBM who were paid less in commissions than what their formulas provided filed lawsuits against IBM, premising their claims on breaches of the IPL, namely by filing claims for breach of contract.

27.     IBM prevailed in all of those cases, by pointing to language in the IPLs stating that the IPLs were not enforceable contracts and did not obligate IBM to pay anything, thereby convincing the courts that the IPLs could not be the basis for a breach of contract claim and ancillary claims.

28.     Beginning in 2016, Mr. Wolfenden's undersigned counsel began filing cases against IBM for unpaid sales commissions that were fundamentally different from the earlier cases. Namely, the new cases focused on fraud, negligent misrepresentation, and related claims based on IBM's promise in written PowerPoint presentations regularly provided to the salespeople that their commissions were "uncapped," when in fact IBM would sometime cap commissions (i.e. pay less than the sales person's commissions formula provides for).

29.     Many of those courts have now ruled on the viability of those new claims, which heavily depend on undisputed facts, and the vast majority of those rulings vindicated the plaintiffs:

> a.  IBM moved to dismiss in seven of the cases. Five district courts denied those motions in relevant part: *Vinson v. IBM*, 2018 WL 4608250 (M.D.N.C. Sept. 25, 2018); *Swafford v. IBM*, 383 F.Supp.3d 916 (N.D. Cal. 2019); *Beard v. IBM*, 2019 WL 1516592 (N.D. Cal. Apr. 7, 2019); *Mallon v. IBM*, No. 1:19-cv-00954 (E.D. Va), Dkt. No. 36 **(Ex. A)**; *Choplin v. IBM*, 2017 WL 3822044 (M.D.N.C. Aug. 30, 2017).[2] The other two district courts granted the motions in their entirety. In one of those, *Middleton v. IBM*, 787 Fed. Appx. 619 (11th Cir. 2019), the plaintiff appealed to the Eleventh Circuit, which affirmed in a short unpublished opinion. In the other one, *Fessler v. IBM*, 959 F.3d 146 (4th Cir. 2020),

---

[2] The court in *Choplin* denied IBM's motion to dismiss without considering the IPL, because it was not attached to the complaint, so that decision is not really on the merits. That case was resolved just before trial.

the plaintiff appealed to the Fourth Circuit, which recently reversed in a lengthy published opinion. In short, six of the seven motions to dismiss ultimately failed.

b. IBM moved for summary judgment in three cases. All three district courts denied those motions in relevant part: *Swafford v. IBM*, 408 F.Supp.3d 1131 (N.D. Cal. 2019); *Beard v. IBM*, 2020 WL 1812171 (N.D. Cal. Apr. 9, 2020) and *Stephenson v. IBM*, No. 17-cv-1141 (M.D.N.C.) (Dkt. No. 70) (July 13, 2020) **(Ex. B).**

30.     In short, nine of the ten relevant rulings have concluded that, given the alleged (and substantiated in *Swafford*, *Beard*, and *Stephenson*) set of facts presented in these new cases, the plaintiffs can recover. The essential issue has always been whether, as a matter of law, the IPLs can foreclose the key claims for fraud, negligent misrepresentation, and the like, despite IBM's clear promise that it will not cap commissions. These courts have held that it cannot. As the Fourth Circuit stated when ruling on the fraud and negligent misrepresentation claims:

> A jury could, for example, justifiably find that IBM made inconsistent representations and, given Fessler's past dealings with IBM, it was reasonable to rely on the statements in the PowerPoint presentation or those made by IBM's executives. Alternatively, a jury could find that since the representations that his commission would be uncapped were presented subsequent to Fessler receiving IPLs, it was reasonable for Fessler to understand them as adjustments to the plan's terms. Regardless, we do not accept IBM's argument that Fessler was required to rely on the nonbinding IPL and ignore all other representations by IBM officials and his past experiences with the company.

(*Fessler*, 959 F.3d at 154).

31.     The courts in *Swafford* and *Beard* held similarly. *Swafford*, 408

F.Supp.3d at 1147 ("[A]s the Court previously explained in its Order on the Motion to Dismiss, 'IBM should not be allowed to make inconsistent representations and then insist that, as a matter of law, its sales representatives were incorrect to rely on IBM's representations.'"); *Beard*, 2020 WL 1812171 at *7 ("As held in a prior order, '[i]t will be a question of fact for the jury whether the reliance was reasonable.'")). Because the IPLs were not the trump card that IBM claimed they were, these courts allowed all the principal claims to proceed: for misrepresentation, unjust enrichment, quantum meruit, punitive damages, etc.

32.     Similar to these cases, Mr. Wolfenden was promised that he would be paid for the sales that closed, yet Acoustic failed to pay Mr. Wolfenden the money his commissions formula reflected he should be paid for the Software Deal.

### Plaintiff Was Not Paid Any Sales Commissions
### for a Multi-Million Dollar Deal He Closed in January 2020

33.     Mr. Wolfenden has been working as a sales representative for various technology companies since 2004.

34.     During his career, he has been highly successful, routinely exceeding his assigned quotas and winning intra-company awards for his accomplishments.

35.     In 2014, a company Mr. Wolfenden was working for, Silverpop Systems, Inc., was acquired by IBM, and he joined IBM as part of the acquisition.

36.     Upon joining IBM, Mr. Wolfenden exceeded his quota every year, and was paid uncapped commissions in accordance with his commissions formula during every sales period.

37.     After the divestiture, Mr. Wolfenden was transitioned to Acoustic along with many other IBM employees who worked with the divested assets.

38.     Mr. Wolfenden was provided with an IPL for each sales period at Acoustic just like he was when he was at IBM.

39.     At the beginning of each sales period, he was also provided education regarding the terms of the compensation plan. That education was in the form of PowerPoint-type presentations, oral education from managers, and documents that were provided to him by Acoustic.

40.     Early in 2020, Ms. Theresa Banuelos ("Ms. Banuelos") presented Mr. Wolfenden with a PowerPoint presentation that explained the 2020 compensation plan, as well as the commissions calculator. Ms. Banuelos was the VP of Sales, Americas—a high-ranking manager for Acoustic.

41.     During Ms. Banuelos' presentation and explanation of the commissions calculator, she explained that commissions at Acoustic/IBM worked simply: close sales, and get paid the commissions as calculated by the commissions calculator. In other words, Ms. Banuelos represented that Mr. Wolfenden would get paid according to the formula in his commissions plan, as a rote matter of simple calculation.

42.     As he had done time and time again, Mr. Wolfenden successfully closed deals at Acoustic, selling more than triple his quota in 2019.

43.     The Software Deal, which Mr. Wolfenden started working on in 2019, ultimately closed January 31, 2020.

44.     The deal was for a total of $2,179,080 in commissionable revenue.

9

45.     Mr. Wolfenden's commissions formula generated a commissions payment due to him of $820,714 from the Software Deal.

46.     Mr. Wolfenden's commission payment for the Software Deal should have been made to him at the end of April 2020.

47.     Shortly after the Software Deal was closed, Mr. Wolfenden was told that his payment had been approved by his management, as well as by Acoustic's CEO at the time, Mark Simpson, and by a managing director from Centerbridge, Michael Streit.

48.     After that, two individuals in the sales operations department at Acoustic, Mary Pierce and Christine Russell, accounted for the deal signing, accounted for Mr. Wolfenden's revenue attainment, and even manually calculated his commissions earnings (using the commissions calculator), generating a commissions statement to be sent to IBM's payroll that showed he had earned, and should be paid, $820,714.

49.     However, Mr. Wolfenden was not paid any of the sales commission on the Software Deal.

50.     Instead, he was terminated on February 11, 2020.

51.     Acoustic claimed that Mr. Wolfenden was terminated because a few business travel expenses from 2018 and 2019 were out of compliance with expense reporting policies.

52.     None of those expenses were related to the Software Deal in any way.

53.     Notably, Acoustic and IBM's expense review was finished in mid-December 2019.

54.     Acoustic and IBM took the position that Mr. Wolfenden was no longer owed sales commissions from the Software Deal. In other words, they believed that they did not have to pay Mr. Wolfenden $820,714 that he had earned closing a large deal for the company, because travel expenses from 12-18 months prior were allegedly out of compliance with its guidelines, even though none of those expenses had anything to do with the Software Deal.

55.     Of course, there was nothing wrong with Mr. Wolfenden's expenses. Mr. Wolfenden addressed all questions raised regarding his prior travel expenses, but Acoustic and IBM still refused to pay him the commissions earned from the Software Deal.

56.     Nothing in the commissions plan allowed Acoustic or IBM to deny Mr. Wolfenden his commissions from the Software Deal.

57.     Acoustic retained the $820,714 and did not pay to any other sales employee the money that Mr. Wolfenden was owed.

58.     Further, even if there were expense violations (which there were not), Acoustic and IBM are barred from relying on those to avoid paying Mr. Wolfenden because they were submitted to IBM while Mr. Wolfenden was an IBM employee only before Acoustic had even been formed.

59.     Acoustic and IBM, by their conduct and through promises from Acoustic managers and executives, from sales management all the way up to the CEO of the

company, waived any right that they may have had to bar Mr. Wolfenden from his commissions because they promised him that he would be paid after they were on notice of any issues with his expenses.

## FIRST CLAIM FOR RELIEF
### (Violation of the Connecticut Wage Protection Statutes)

60.     Plaintiff re-alleges and incorporates the prior paragraphs as if fully set forth herein.

61.     Acoustic is an "employer" as defined in Conn. Gen. Stat. § 31-71a.

62.     IBM is an "employer" as defined in Conn. Gen. Stat. § 31-71a.

63.     Mr. Wolfenden was an "employee" of Acoustic and/or IBM pursuant to Conn. Gen. Stat. § 31-71a.

64.     While employed by Acoustic and/or IBM, Mr. Wolfenden was paid a base salary and commissions.

65.     The commissions component of Mr. Wolfenden's compensation constitutes "wages" under Conn. Gen. Stat. § 31-71a. This includes the commissions that he is still owed by Acoustic and/or IBM, as alleged herein.

66.     Mr. Wolfenden earned the commissions from the Software Deal as alleged herein. Mr. Wolfenden's entitlement to these commissions is reflected in Acoustic and IBM's representations that he would be paid for what he sold as calculated by his commissions calculator, approvals from his managers to pay him the commissions at issue, and by the manual commissions statement that Acoustic generated and sent to IBM's payroll for payment.

67.     Acoustic and/or IBM's wrongful refusal to pay the commissions owing to Wolfenden from this deal violates Conn. Gen. Stat. § 31-72, as well as Conn. Gen. Stat. § 31-71(c), as Mr. Wolfenden was not paid these wages timely upon his separation from Acoustic and/or IBM.

68.     Acoustic and IBM's refusal to pay the commissions owing to Mr. Wolfenden, despite his demands for the same, was arbitrary and unreasonable and arose out of Acoustic and IBM's interest in increased financial gain for themselves from the work performed by Mr. Wolfenden.

69.     As a result of Acoustic and IBM's violations of Conn. Gen. Stat. § 31-72, Mr. Wolfenden has suffered damages in an amount exceeding $75,000, and is entitled to twice the full amount of commissions owed, plus prejudgment interest, costs, and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF
### (Fraudulent Misrepresentations and Omissions/Concealment)

70.     Plaintiff re-alleges and incorporates the prior paragraphs as if fully set forth herein.

71.     Acoustic and IBM, through their agents, concealed from Plaintiff until after he closed the Software Deal that it intended to fire him and withhold all of his sales commissions from the Software Deal.

72.     Had Acoustic or IBM disclosed this information to Plaintiff prior to the performance of his work in closing the Software Deal, he would not have closed the deal, or he otherwise would have acted differently, for example, by not working as

hard as he did on the Software Deal in reliance on Acoustic and IBM's representations that he would be paid according to the simple commissions formula.

73.     Acoustic and IBM intended to deceive Mr. Wolfenden by omitting this material information. Simply put, Acoustic and IBM knew that they intended not to pay Plaintiff for the closure of the Software Deal before he closed it. Yet, Acoustic and IBM did not tell Mr. Wolfenden this because they wanted him to close the deal and generate revenue for Acoustic and IBM.

74.     Acoustic and IBM had a duty to speak because (a) they chose to speak by telling Mr. Wolfenden that he would be paid commissions for deals that he closed, thereby taking on a duty to make a full and fair disclosure of facts concerning the matters on which Acoustic and IBM chose to speak; and (b) they took affirmative steps to conceal material facts from Mr. Wolfenden. Acoustic and IBM failed to fulfill their duties to speak and make a full and fair disclosure of the facts. Plaintiff justifiably relied on Acoustic and IBM's silence about those facts, and he was injured as a result of Acoustic and IBM's fraudulent concealment.

75.     Acoustic and IBM also represented that payment was straightforward on Mr. Wolfenden's compensation plan: he was to be paid pursuant to a formula contained in his commissions calculator, with accelerators for overachievement. Acoustic and IBM continuously represented to Mr. Wolfenden, as it always had, that Acoustic and IBM intended to pay him according to the formula in his commissions plan and that Mr. Wolfenden would be paid according to that formula. Those representations were false, because Acoustic and IBM—when they made them—

14

intended to terminate Mr. Wolfenden and not pay him according to the formula. In making those representations, Acoustic and IBM intended for Mr. Wolfenden to rely on them by continuing to work on the Software Deal, to the benefit of Acoustic and IBM. Plaintiff relied on Acoustic and IBM's representations, as he had in the past, which had always been true.

76.     His reliance was reasonable and justified.

77.     As set forth in this complaint, those representations were false.

78.     Acoustic and IBM knew that those representations were false at the time it made them or, alternatively, made those representations recklessly or without belief in the truth. Acoustic and IBM made those false representations anyways because they intended to deceive Mr. Wolfenden and induce him to act upon those false representations.

79.     Plaintiff did act upon those false representations to his injury and was in fact deceived by Acoustic and IBM.

80.     Plaintiff was damaged by Acoustic and IBM's fraudulent misrepresentations and omissions/concealment in an amount exceeding $75,000.

### THIRD CLAIM FOR RELIEF
**(Negligent Misrepresentation/Omission)**

81.     Plaintiff re-alleges and incorporates the prior paragraphs as if fully set forth herein.

82.     Plaintiff alleges this claim in the alternative to his claim for fraudulent misrepresentation and/or fraudulent omissions/concealments.

83.     Acoustic and IBM, through their agents, concealed from Plaintiff until after he closed the Software Deal that they intended to fire him and not pay him any commissions from the Software Deal.

84.     Acoustic and IBM's agents made these omissions/concealment negligently, without exercising the care that a reasonable person would under the circumstances. Acoustic and IBM made the representations with the knowledge and intention that Plaintiff would change his efforts had he known the truth about Acoustic and IBM's intention not to pay him for his efforts.

85.     Mr. Wolfenden reasonably and justifiably relied on the representations and omissions of Acoustic and IBM, by, among other things, continuing to work hard and sell as much software and services as possible for the benefit of Acoustic and IBM.

86.     Had Plaintiff known that he would not be paid what he was promised and what he expected, he would have worked differently at Acoustic and IBM, commensurate with his actual compensation, and/or he would have sought other jobs that paid him what his efforts were worth.

87.      Acoustic and IBM also represented that payment was straightforward on Mr. Wolfenden's compensation plan: he was to be paid pursuant to a formula contained in his commissions calculator, with accelerators for over achievement.

88.     That representation was false.

89.     Acoustic and IBM owed Mr. Wolfenden a duty of care in making the representations. When Acoustic and IBM made that misrepresentation, they had the means of knowing, ought to have known, and had the duty of knowing the truth.

90.     Plaintiff reasonably and justifiably relied on the representations of Acoustic and IBM.

91.     Mr. Wolfenden was damaged by Acoustic and IBM's negligent representations and/or omissions in an amount exceeding $75,000.

## FOURTH CLAIM FOR RELIEF
### (Unjust Enrichment/Quantum Meruit – Acoustic only)

92.     Plaintiff re-alleges and incorporates the prior paragraphs as if fully set forth herein.

93.     To the extent that there was no written contract and to the extent that there was no oral or implied contract, then Mr. Wolfenden alleges a claim for unjust enrichment.

94.     At the specific request of Acoustic, and for its use and benefit, Mr. Wolfenden performed work for Acoustic in the form of making sales of its software and services.

95.     Acoustic was in fact benefitted by Mr. Wolfenden's work described herein.

96.     Acoustic unjustly did not pay Mr. Wolfenden for the benefits it received.

97.     The failure of payment by Acoustic was to Mr. Wolfenden's detriment.

98.     The value of the work performed for Acoustic by Mr. Wolfenden for which he has not been paid is at least $820,714, although the exact amount is for determination by the jury.

99.     There is due and owing to Mr. Wolfenden from Acoustic, a principal sum amount of at least $820,714.

100.    Despite Mr. Wolfenden being owed in excess of $800,000, Acoustic has failed and refused to pay the same or any part of it.

101.    Acoustic still has all $820,714 in its possession and that money is rightfully owed to Mr. Wolfenden for the work that he did for Acoustic on the Software Deal.

102.    As a result of Acoustic's refusal to pay Mr. Wolfenden the above-stated sum due and owing to him, Acoustic has become unjustly enriched in the amount of at least $820,714.

## FIFTH CLAIM FOR RELIEF
### (Civil Conspiracy)

103.    Plaintiff re-alleges and incorporates the prior paragraphs as if fully set forth herein.

104.    At all times relevant, Acoustic and IBM conspired together to achieve their shared goal to fire Mr. Wolfenden, using an expense investigation as pretext, to avoid paying him the commission that he was rightfully owed on the Software Deal.

105.    Acoustic's and IBM's conspiracy and agreement, as set forth in this complaint, was to do an unlawful act or a lawful act in an unlawful way.

106.    Both Acoustic and IBM committed acts pursuant to the scheme and in furtherance of the conspiracy, including (i) concealing their intent to terminate Mr. Wolfenden as soon as he closed the Software Deal, (ii) actually terminating Mr. Wolfenden, (iii) initiating and conducting a sham investigation of Mr. Wolfenden's expenses after they knew the Software Deal was likely to close and generate a large commission, (iv) refusing to pay Mr. Wolfenden his Software Deal commission, and (v) as otherwise described in this complaint.

107.    Acoustic and IBM's acts resulted in damage to Mr. Wolfenden in an amount exceeding $75,000.

### SIXTH CLAIM FOR RELIEF
### (Punitive Damages)

108.    Plaintiff re-alleges and incorporates the prior paragraphs as if fully set forth herein.

109.    The actions and conduct of Acoustic and IBM, as set forth herein, entitle Mr. Wolfenden to compensatory damages, and are accompanied by aggravating factors which caused and relate to Mr. Wolfenden's injuries which give rise to his claim for compensatory damages.

110.    This conduct, as set forth herein, includes, among other things, fraud.

111.    Acoustic and IBM's conduct displayed a reckless indifference to the rights of Mr. Wolfenden and others and an intentional and wanton violation of those rights giving rise to punitive damages, as set forth herein and otherwise.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Wolfenden prays for the following relief:

1.      That Mr. Wolfenden have and recover from Acoustic and IBM for their violations of the Connecticut Wage Statutes in the amount exceeding $75,000, and interest, costs, liquidated damages, exemplary damages, and attorneys' fees as allowed by law;

2.      That Mr. Wolfenden have and recover from Acoustic and IBM for fraudulent misrepresentation/omission/concealment in the amount exceeding $75,000, and interest and costs as allowed by law;

3.      That Mr. Wolfenden have and recover from Acoustic and IBM for negligent misrepresentation/omissions/concealment in the amount exceeding $75,000, and interest and costs as allowed by law;

4.      That Mr. Wolfenden have and recover from Acoustic for unjust enrichment in an amount to be determined at trial, plus interest on the judgment until paid in full at the legal rate as allowed by law;

5.      That Acoustic and IBM be held jointly liable because they engaged in a civil conspiracy together;

6.      That Mr. Wolfenden be awarded punitive damages;

7.      That all costs of this action, including attorneys' fees, be taxed against Acoustic and IBM; and

8.      That the Court award Mr. Wolfenden such other and further relief as the Court may deem just and proper.

Dated:  August 11, 2020

BY:     /s/ *Alex R. Straus*
        Matthew E. Lee*
        Jeremy R. Williams*
        Alex R. Straus (AS-1690)
        **WHITFIELD BRYSON LLP**
        900 W. Morgan Street
        Raleigh, NC 27603
        Telephone: (919) 600-5000
        Facsimile: (919) 600-5035
        matt@whitfieldbryson.com
        jeremy@whitfieldbryson.com
        alex@whitfieldbryson.com

        Mark R. Sigmon*
        **SIGMON LAW, PLLC**
        5 W. Hargett St., Suite 1001
        Raleigh, NC 27601
        Telephone: (919) 451-6311
        Fax: (919) 882-9057
        mark@sigmonlawfirm.com

        *Plaintiff's Attorneys*

        * *pro hac vice* application forthcoming