# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

WILLIAM STEPHENSON,            )
                               )
              Plaintiff,       )
                               )
        v.                     )        17cv1141
                               )
INTERNATIONAL BUSINESS         )
MACHINES CORPORATION,          )
                               )
              Defendant.       )

## <u>MEMORANDUM OPINION AND ORDER</u>

THOMAS D. SCHROEDER, Chief District Judge.

Plaintiff William Stephenson alleges that Defendant International Business Machines Corporation ("IBM") failed to pay sales commissions due him. Following this court's partial grant of IBM's earlier motion to dismiss, Stephenson seeks damages under four remaining causes of action: (1) fraudulent misrepresentation, (2) negligent misrepresentation, (3) unjust enrichment, and (4) quantum meruit.[1] Before the court is IBM's motion for summary judgment on all causes of action. (Doc. 45.) Following full briefing, the court held oral argument on the motion. For the reasons set forth below, the motion will be denied.

## I.   BACKGROUND

The facts, viewed in the light most favorable to Stephenson,

---

[1] Because the motion to dismiss was pending when IBM filed the present motion for summary judgment, briefing that addressed claims that are now dismissed will be regarded as moot.

as the non-moving party, are as follows:

Stephenson -- an experienced information technology professional -- began working for IBM in 2011 as a sales representative selling "z" software to its corporate customers. (Doc. 51-2 at 26:5-27:2; 28:8-11.)[2]  Stephenson's compensation consisted of a base salary and commissions. (Id. at 28:16-29:10.) IBM distributed its commission payment policy -- also known as an "Incentive Plan" -- biannually to its sales representatives, Stephenson among them, via an Incentive Plan Letter ("IPL") and a website, which also contained a PowerPoint slide presentation about the Incentive Plan. (Doc. 51-6.)  Together, the IPL and Incentive Plan information, including the PowerPoint, were known as the "Plan." (Id. at 3.)

The IPL at issue here, covering January 1 to June 30, 2015, provided employees with their Incentive Plans, which gave more specific details and included an intranet web address for employees to find more information about their Incentive Plan. (Id.)  A section at the end of the IPL styled "OTHER IMPORTANT INFORMATION" provided the following:

> **Right to Modify or Cancel:** The Plan does not constitute an express or implied contract or a promise by IBM to make any distributions under it.  IBM reserves the right to adjust the Plan terms, including, but not limited to, changes to sales performance objectives (including management-assessment objectives), changes to assigned customers, territories, or account

---

[2] All deposition citations are to the transcript, not docket, page.

2

opportunities, or changes to applicable incentive payment rates or quotas, target incentives or similar earnings opportunities, or to modify or cancel the Plan, for any individual or group of individuals, at any time during the Plan period up until any related payments have been earned under the Plan terms. . . .[3]

\*   \*   \*

**Full-Plan Earnings:** Regardless of your start date, your incentive payments are earned under the Plan terms, and are no longer considered Plan-to-Date advance payments, only after the measurement of complete business results following the end of the full-Plan period or (if applicable) after the measurement of complete business results after the date you left the Incentive Plan early.  Incentive payments will be considered earned only if you have met all payment requirements, including: (1) you have complied with the Incentive Plan, the Business Conduct Guidelines and all other applicable IBM employment policies and practices; (2) you have not engaged in any fraud, misrepresentation or other inappropriate conduct relating to any of your business transactions or incentives; (3) and the customer has paid the billing for the sales or services transaction related to your incentive achievement.

\*   \*   \*

**Significant Transactions:** IBM reserves the right to review and, in its sole discretion, adjust incentive achievement and/or related payments associated with a transaction which (1) is disproportionate when compared with the territory opportunity anticipated during account planning and used for the setting of any sales objectives; or for which (2) the incentive payments are disproportionate when compared with your performance contribution towards the transaction.

---

[3] The clause further provided:  "Managers below the highest levels of management do not know whether IBM will or will not change or adopt any particular compensation plan; they do not have the ability to change the Plan terms for any employee; nor are they in a position to advise any employee on, or speculate about, future plans.  Employees should make no assumptions about the impact potential Plan changes may have on their personal situations unless and until any such changes are formally announced by IBM."  (Doc. 51-6 at 4.)

(Id. at 3-6.)

Stephenson accepted the terms of the pertinent IPL electronically in early 2015. (Doc. 51-6; Doc. 51-2 at 47:22-48:3.) Before and after he agreed to its terms, he also viewed the IBM PowerPoint presentation for sales representatives that provided details regarding the Incentive Plan. (Doc. 51-2 at 53:15-54:5.) The PowerPoint was titled, "Our Purpose, Values & Practices, Your 2015 Incentive Plan, Individual Quota Plan (IQP) -- Employees." (Doc. 51-7.) IBM used the PowerPoint to give its sales representatives important information to understand how their compensation worked under the Incentive Plan. (Doc. 51-5 at 29:12-30:3.) The PowerPoint generally represented IBM's understanding of the Incentive Plan and, as applicable to salespeople like Stephenson, contained statements about sales commissions that "[e]arnings opportunity remains uncapped" and that "payments" were "uncapped." (Doc. 51-7; Doc. 51-5 at 22:5-23:7; Doc. 51-1 at 53:8-54:13; Doc. 51-3 at 53:5-14.)

As part of his work at IBM, Stephenson was assigned accounts with Branch Banking and Trust ("BB&T") and Laboratory Corporation of America ("LabCorp").[4] (Doc. 51-2 at 94:18-24.) At IBM's behest, Stephenson was successful in closing a large deal with each by June 30, 2015. (Doc. 51-1 at 85:18-87:11; Doc. 51-2 at 164:19-

---

[4] Stephenson's allegations as to reductions in commissions on a third deal have been abandoned. (Doc. 50 at 5 n.6.)

165:3.)  The commission payments he would receive from these two deals were governed by the IPL.  Stephenson had been working on both deals since 2013.  (Doc. 51-1 at 81:12-23.)  The BB&T contract had a value of $92,000,000, with Stephenson's team's contribution of "z" software comprising $13,500,000.  (Doc. 51-15.)  The LabCorp contract was valued at $43,000,000, with "z" software contributing a value of $9,300,000.  (Id.)

Because of the size of these two deals, IBM began a formal review of commission payments to all employees who participated in them on July 10, 2015.  (Doc. 51-4 at 118:25-119:19; Doc. 51-5 at 177:5-17.)  Randolph Moorer, IBM's Vice President of Software for the company's IBM's Mid-Atlantic Region, took the lead.  He determined that Stephenson's anticipated commission payments required reconsideration.  (Doc. 51-4 at 50:5-24.)  In one email to Cleo Clarke, one of Stephenson's supervisors, Moorer stated that IBM "will need to take a very hard look at [Stephenson's commissions] and determine the appropriate payment commensurate with [his] effort and contribution."  (Doc. 51-16.)  In a follow-up email, he told Clarke that "we have a serious problem in that the commissions payout for these two deals exceed the maximum and all high achievers including [Stephenson] must be reviewed."  (Id.)

Stephenson's commissions stood out to IBM because he was expected to receive 23% of all commissions paid out on the BB&T deal and 24% of all commissions paid out on the LabCorp deal.

5

(Doc. 46-7 ¶¶ 5, 6.)  To help make determinations about how much commissions ought to be paid to employees, IBM used an Expense-to-Revenue ratio ("E/R Ratio"), which referred to the ratio of commissions to be paid on a deal to the revenue the deal would generate.  (Doc. 51-4 at 72:1-7.)  Moorer testified that generally, whenever a deal's E/R ratio exceeded 10% -- that is, whenever more than 10% of a deal's incoming revenue was to be spent on commissions -- IBM would review the deal and commission payouts to ensure everything was "appropriate." (Id. at 72:10-12.)  According to Moorer, the 10% E/R ratio is not a ceiling but a general target that IBM seeks to meet.  (Id. at 80:7-22.)  Before IBM reduced Stephenson's commissions, the BB&T deal had an E/R Ratio of 13.34% and the LabCorp deal had an E/R Ratio of 16.89%.  (Id. at 139:13-17; 99:21-25; Doc. 51-25; Doc. 51-27.)

After receiving feedback from Stephenson's managers, Moorer discussed with Phil Weintraub,[5] IBM's Vice President of the "z" systems Stephenson sold, how to evaluate Stephenson's commission payments and how to reduce the E/R Ratios in both deals to get closer to 10%.  (Doc. 51-4 at 86:23-87:13; 138:24-139:3; 50:19-51:5.)  Moorer testified that when he conducts a "performance contribution" analysis under the Significant Transactions clause in the IPL, he does not have a specific set of guidelines or

---

[5] Weintraub was not deposed.

6

criteria but makes decisions based on a "gut feel" or "judgment call." (Id. at 96:1-4.) He was not able to recall, however, how he arrived at certain figures regarding Stephenson's relative contribution to the BB&T and LabCorp deals. (Id. at 96:3-4.) He did not regard his changes to commission payments as final decisions, but only as recommendations he forwarded to Richard Martinotti -- IBM's Finance Manager for Software -- for approval. (Id. at 128:11-15.) Martinotti insisted at his deposition that he did not alter or recommend any changes to the reductions in commissions on either deal. When asked why Stephenson's commissions were reduced, Martinotti deferred to Moorer, noting that he only passed Moorer's recommendations on to other members of upper management for approval and, once approved, implemented them. (Doc. 51-5 at 187:12-24; 188:23-190:1; 190:19-23; 192:14-193:11.) A July 10, 2015 email from Martinotti to Moorer, however, reminded Moorer that "[a]s has always been the case, the process in not intended to cap, but rather ensure that payments are commensurate with the contribution of the rep and that there are no anomalies in quota or territory that could have caused an inappropriate payment, and/or result in recoveries after the fact." (Doc. 51-28 at 2.)

Moorer's recommendations were eventually adopted, and the E/R Ratio on the BB&T deal fell from 13.34% to 10% (Doc. 51-28), while the E/R Ratio on the LabCorp deal was reduced from 16.89% to 14.28%

7

(Doc. 51-27).  This caused Stephenson's total commissions to be reduced by approximately $598,000.  (Doc. 51-17.)

Once Stephenson's final commissions were paid, Moorer contacted Clarke to update her.  (Id.)  Clarke expressed concern that Stephenson, who had already determined his expected commission payments through a calculation system IBM provided its employees, would be upset by such a significant reduction in his commissions.  (Id.)  When Stephenson approached his managers for an explanation about his reduced commissions, Moorer explained that the company "need[ed] to ensure [it] maintain[ed] an affordable expense posture on each transaction and commissions should account for about 10% of the total deal value."  (Doc. 51-18.)  Stephenson was told that "there was not sufficient budget to allow a full payout, so reductions had to be made."  (Id.)  Dissatisfied with this explanation (Doc. 51-19), he voluntarily left IBM a year later (Doc. 51-2 at 21:11-16).

Stephenson filed the present action in December 2017 alleging six claims for relief: (1) breach of oral and/or implied contract (Doc. 1 ¶¶ 42-45); (2) in the alternative, quantum meruit (id. ¶¶ 46-51); (3) in the alternative, unjust enrichment (id. ¶¶ 52-59); (4) fraudulent misrepresentation (id. ¶¶ 60-65); (5) in the alternative, negligent misrepresentation (id. ¶¶ 66-75); and (6) punitive damages (id. ¶¶ 76-79).  All claims stem from IBM's statements that it would not "cap" his commissions, which were

8

contained in the PowerPoint he viewed between January 1 and June 30, 2015, that detailed his compensation plan, as well as alleged oral statements by IBM managers.  IBM moved for partial judgment on the pleadings (Doc. 38) based on this court's decision in a similar case, <u>Vinson v. Int'l Bus. Machs. Corp.</u>, No. 1:17-cv-00798, 2018 WL 4608250 (M.D.N.C. Sept. 25, 2018), in which this court dismissed some of the claims of the IBM employee.  Over Stephenson's opposition, this court granted IBM's motion and dismissed Stephenson's claims alleging breach of contract, fraudulent and negligent representations (to the extent they were based on statements of IBM executives, but not as to the claims based on the statements in the PowerPoint), and punitive damages (to the extent pleaded as a separate claim, but not as to the prayer for relief).  (Doc. 48.)  IBM's current motion for summary judgment is directed toward all remaining claims.

A hearing was held on IBM's summary judgment motion on October 29, 2019.  A month later, the court stayed this case pending the Fourth Circuit's decision in a similar case, <u>Fessler v. Int'l Bus. Machs. Corp.</u>, which was decided on May 14, 2020.  959 F.3d 146 (4th Cir. 2020).  The parties each filed briefs addressing the impact of the Fourth Circuit's decision (Docs. 67, 68) and the motion is ready for decision.

## II. ANALYSIS

Summary judgment is appropriate "if the movant shows that

9

there is no genuine dispute as to any material fact and the movant
is entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a). "A genuine issue of material fact exists 'if the evidence
is such that a reasonable jury could return a verdict for the
nonmoving party.'" Basnight v. Diamond Developers, Inc., 146 F.
Supp. 2d 754, 760 (M.D.N.C. 2001) (quoting Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986)). In determining a motion
for summary judgment, the court views the "evidence in the light
most favorable to the non-moving party, according that party the
benefit of all reasonable inferences." Id. Summary judgment
should be denied "unless the entire record shows a right to
judgment with such clarity as to leave no room for controversy and
establishes affirmatively that the adverse party cannot prevail
under any circumstances." Guessford v. Pa. Nat'l Mut. Cas. Ins.
Co., 983 F. Supp. 2d 652, 659 (M.D.N.C. 2013) (quoting Campbell v.
Hewitt, Coleman & Assocs., Inc., 21 F.3d 52, 55 (4th Cir. 1994)).
With this standard in mind, the court will address IBM's motion as
to each of the remaining claims.

### A.    Fraudulent Misrepresentation

A fraudulent misrepresentation claim under North Carolina law
requires a showing of "(1) [a] [f]alse representation or
concealment of a material fact, (2) reasonably calculated to
deceive, (3) made with intent to deceive, (4) which does in fact
deceive, (5) resulting in damage to the injured party." Forbis v.

10

Neal, 649 S.E.2d 382, 387 (N.C. 2007).  Further, "any reliance on the allegedly false representations must be reasonable."  Id.  IBM argues that Stephenson has failed to show a false statement, intent to deceive, and reasonable reliance.  Stephenson contends that he has established a genuine dispute as to whether IBM's PowerPoint presentation intentionally misled him to believe that his commissions would not be capped, and that IBM improperly and arbitrarily capped his commissions in disregard of the terms of the IPL.  Each element of the claim will be addressed in turn.

As to the first element, IBM contends that its statements in the PowerPoint that "[e]arnings opportunity remains uncapped" and commission "payments" were "uncapped" were not false.  IBM argues that, by reading the IPL and PowerPoint together, it is apparent that because the IPL grants IBM discretion to reduce commissions on significant transactions, the capping language in the PowerPoint necessarily refers to a salesperson's "overall commissions or earnings" and thus does not limit the number of deals a sales representative can conduct.  According to IBM, "an adjustment to commissions on a specific deal is not a cap on a sales representative's overall ability to earn commissions." (Doc. 46 at 22.)  It points to the fact that in the first half of 2015, IBM did not reduce Stephenson's commissions on other deals, and he made more than he ever made in his 30-year career. Stephenson contends that IBM's construction of the Plan is not

11

apparent from the IPL or the PowerPoint, and the disclaimers in the IPL are at best ambiguous.

The representations that "earnings opportunity" and commission "payments" were "uncapped" do not unambiguously suggest that the limitation applies only to aggregate commissions, as IBM urges. Stephenson's construction of the representations conflicts with the IPL to the extent the IPL clearly states IBM's discretion to alter or amend the Plan or commissions. Consequently, Stephenson can claim falsity only if he can demonstrate that IBM reduced his commissions outside its discretion provided by the IPL.

IBM contends that it reduced Stephenson's commissions by exercising its discretion under the Significant Transactions clause in the IPL.[6] In its briefing, IBM relies on the second prong of the Significant Transactions clause that permitted it to determine whether "the incentive payments are disproportionate when compared with [the employee's] performance contribution towards the transaction." (Doc. 46 at 29.) Stephenson contends that the record demonstrates a genuine question whether IBM in fact applied this prong and that, if a jury found it did not, there is sufficient evidence that IBM instead arbitrarily and

[6] As noted _infra_, the parties dispute whether Stephenson's commissions were "earned" under the IPL. Because IBM relies on the Significant Transactions clause here, whether or not the commissions were "earned" is not dispositive to the analysis.

12

impermissibly reduced his commissions after having led him to believe it would not do so.

Stephenson is correct.  The relative contribution prong of the Significant Transactions clause gave IBM the discretion to adjust commission payments that "are disproportionate when compared with [Stephenson's] performance contribution towards the transaction."  (Doc. 51-6.)  IBM's witnesses described using a "relative contribution" analysis to determine what a salesperson was "personally responsible for" in a given deal.  (Doc. 51-3 at 101:23–102:2; Doc. 51-5 at 180:15–22.)  Or, as Randolph Moorer testified, what a salesperson contributed "compared to everyone else in the transaction." (Doc. 51-4 at 87:14–24; 95:19–23.) But Stephenson has presented sufficient conflicting evidence as to whether IBM actually performed the relative contribution analysis represented in the Significant Transactions clause.

Moorer testified that IBM generally tries to keep commission payments to an E/R Ratio of 10%, meaning that aggregate commission payments should not exceed 10% of a given deal.  IBM usually examined commission payments "anytime" the E/R Ratio on a deal exceeded 10%.  (Id. at 72:10–12.)  Martinotti, the company's Rule 30(b)(6) witness[7] and Moorer's boss, also testified that IBM used

---

[7] Federal Rule of Civil Procedure 30(b)(6) provides: "In its notice or subpoena, a party may name as the deponent a public or private corporation . . . and must describe with reasonable particularity the matters for examination.  The named organization must then designate one

13

the E/R Ratio as a guidepost on all IBM deals. (Doc. 51-5 at 177:20-179:9.) According to Moorer, the need to reduce the top earners' commissions, such as Stephenson's, was "probably" based on a need to reduce total commissions by $650,000. (Doc. 51-4 at 97:7-13.) Consistent with that, Stephenson was told that "there was not sufficient budget to allow a full payout, so reductions had to be made." (Doc. 51-18; Doc. 51-3 at 105:3-13.) Both of Stephenson's managers also indicated that they understood IBM had reduced his commissions because of budgetary reasons. (Doc. 51-1 at 142:10-25; Doc. 51-3 at 104:13-16.)

Moreover, IBM did not redistribute commission payments it reduced, as might be expected in a comparative analysis, but instead retained the money it cut from Stephenson's original commission payout. (Doc. 51-4 at 105:7-23; 140:24-141:9.) Indeed, Moorer characterized the commission payments that were not paid to Stephenson as an "expense not incurred" by IBM. (Id. at 141:9.) This stands in contrast to Martinotti's email to Moorer that "the process is not intended to cap" (Doc. 51-28 at 2) and his testimony that IBM does not have a budget for commission payments and does not reduce commissions pursuant to budgetary concerns. In fact, if commissions were changed to stay on budget, he noted, such a

---

or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify. . . ."

14

reduction would be "questionable." (Doc. 51-5 at 191:19-192:17).[8] These reasons -- arbitrarily reducing commissions to adhere to a budget -- are inconsistent with the terms of the Significant Transactions clause. Thus, a dispute of material fact exists as to whether IBM made false statements in its PowerPoint with the representations that commissions and payments would be "uncapped" if the company reduced Stephenson's commissions on a basis not authorized by the IPL.

IBM next argues that there is no evidence it intended to deceive Stephenson into believing that his commissions would not be capped. To show intent in a fraud claim, Stephenson must demonstrate that IBM had "both knowledge and an intent to deceive, manipulate, or defraud" at the time it made the alleged misrepresentation. RD & J Props. V. Lauralea-Dilton Enters., LLC, 600 S.E.2d 492, 498 (N.C. Ct. App. 2004). Under North Carolina law, a "litigant's state of mind" is often a fact question established by circumstantial, not direct, evidence to be decided by a jury. Johnson v. Phoenix Mut. Life Ins. Co., 266 S.E.2d 610, 619 (N.C. 1980), overruled on other grounds by Myers & Chapman, Inc. v. Thomas G. Evans, Inc., 374 S.E.2d 385, 392 (N.C. 1988). IBM offers the same arguments as to intent that it offered as to

---

[8] Martinotti ultimately did not know what precise process was used to reduce Stephenson's commissions and thus deferred to Moorer who, as noted, relied on the E/R Ratio. (Doc. 51-5 at 187:12-24.)

15

falsity, contending that the IPL and related materials provided "clear disclaimers." (Doc. 46 at 23.) But for the reasons noted above, if a jury were to conclude that IBM did not apply the Significant Transaction clause to Stephenson's commissions at issue, there is evidence from which it could also reasonably conclude that IBM intended all along to limit the size of commissions based on an arbitrary E/R Ratio rather than on Stephenson's relative contribution toward the deals. As both Moorer and Martinotti testified, whenever the E/R Ratio exceeded 10%, IBM would examine the commission payments in an effort to reduce the ratio closer to 10%. In other words, the overall size of the commissions would be capped. There is also evidence from which a jury could conclude that IBM employed this practice at the time Stephenson received the PowerPoint and IPL. (Doc. 51-5 at 177:20-179:9.) Thus, IBM has failed to demonstrate the absence of a genuine issue of material fact as to its intent on Stephenson's fraudulent misrepresentation claim.

Finally, IBM argues that Stephenson cannot show that his reliance on IBM's allegedly false statements in the PowerPoint was reasonable. IBM contends that Stephenson's offer letter and the IPL's Right to Modify or Cancel clause "reserved the right to modify or cancel Plaintiff's Sales Incentive Plan at any time," and it points to the IPL's Significant Transaction clause, which it contends "informed Plaintiff of the possibility that his

16

commissions might be reduced on large deals." (Doc. 46 at 24-25.) These provisions, IBM contends, would have rendered any alleged reliance on the "capping" language unreasonable as a matter of law. (Id.) Stephenson contends that the Right to Modify or Cancel clause is not applicable to his BB&T and LabCorp commissions, which he contends were already "earned," and, for the reasons already noted, he argues that he has created a genuine issue whether IBM followed the Significant Transactions clause in the fashion it claims.

Under North Carolina law, when a plaintiff "must have known the truth" because he had an "alternative source of information" that would dispel the alleged misrepresentation, his fraud claim fails. See Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 341 (4th Cir. 1998). "The reasonableness of a party's reliance is a question for the jury, unless the facts are so clear that they support only one conclusion." State Props., LLC v. Ray, 574 S.E.2d 180, 186 (N.C. Ct. App. 2002); see also Forbis, 649 S.E.2d at 387.

As to IBM's first contention -- the alleged indefinite right to modify or cancel -- the court disagrees. Stephenson's offer letter, dated some three and one-half years earlier (July 27, 2011), states that "[a]ny payments made under IBM Sales Incentive Plan are subject to the terms and conditions of the specific Incentive Plan assigned and the Incentive Plan Letter (IPL)" and

17

that "IBM reserves the right to modify or cancel this program at any time." (Doc. 46-2 at 60.) The letter expressly relies on the terms of the Plan, which is said to control. The letter's remoteness in time renders it subject to modification by subsequent Plans. It appears that other iterations of IBM's Right to Modify or Cancel clause mirrored this disclaimer, and IBM naturally relies on myriad cases finding such language an adequate disclaimer to render any reliance on contrary statements (such as those as to "capping" in the PowerPoint) unreasonable.[9]

But as Stephenson notes, his IPL for the first half of 2015 grants IBM discretion to modify or cancel "at any time *during the Plan period up until any related payments have been earned under the Plan terms*." (Doc. 51-6 at 3-4 (emphasis added).) This additional language altered the previous disclaimer and represented to Stephenson that IBM would not alter or cancel his

---

[9] *See, e.g.*, <u>Wilson v. Int'l Bus. Machs. Corp.</u>, 610 F. App'x 886 (11th Cir. 2015) (per curiam); <u>Kavitz v. Int'l Bus. Machs. Corp.</u>, 458 F. App'x 18 (2d Cir. 2012); <u>Geras v. Int'l Bus. Machs. Corp.</u>, 638 F.3d 1311 (10th Cir. 2011); <u>Jensen v. Int'l Bus. Machs. Corp.</u>, 454 F.3d 382 (4th Cir. 2006); <u>Snyder v. Int'l Bus. Machs. Corp.</u>, No. 1:16-cv-03596-WMR, 2019 U.S. Dist. LEXIS 66583 (N.D. Ga. Mar. 18, 2019); <u>Morris v. Int'l Bus. Machs. Corp.</u>, 1:18-cv-0042-LY, 2018 WL 7291382 (W.D. Tex. Nov. 29, 2018); <u>Rapier v. Int'l Bus. Machs. Corp.</u>, No. 1-17-cv-4740-MHC, 2018 U.S. Dist. LEXIS 117504 (N.D. Ga. Apr. 12, 2018); <u>Pfeister v. Int'l Bus. Machs. Corp.</u>, No. 17-cv-03573-DMR, 2017 WL 4642436 (N.D. Cal. Oct. 16, 2017); <u>Choplin v. Int'l Bus. Machs. Corp.</u>, No. 1:16CV1412, 2017 WL 3822044 (M.D.N.C. Aug. 30, 2017); <u>Kemp v. Int'l Bus. Machs. Corp.</u>, No. 3:09-cv-03682, 2010 U.S. Dist. LEXIS 118801 (N.D. Cal. Nov. 4, 2010); <u>Schwarzkopf v. Int'l Bus. Machs. Corp.</u>, No. C 08-2715 JF, 2010 WL 1929625 (N.D. Cal. May 12, 2010); <u>Gilmour v. Int'l Bus. Machs. Corp.</u>, No. CV 09-04155 SJO, 2009 WL 8712153 (C.D. Cal. Dec. 16, 2009); <u>Rudolph v. Int'l Bus. Machs. Corp.</u>, No. 09 C 428, 2009 WL 2632195 (N.D. Ill. Aug. 21, 2009).

18

Plan after his Plan period and once he "earned" his commissions. Cf. Jensen v. Int'l Bus. Machs. Corp., 454 F.3d 382, 388 (4th Cir. 2006) (holding that a different iteration of an IBM IPL that gave IBM complete discretion to modify the terms of the IPL "at any time" before the commissions were paid was not a binding contract).

There is no dispute that IBM's reductions occurred after the end of the Plan period, June 30, 2015. The question is whether Stephenson had "earned" the commissions within the meaning of the IPL. The IPL's Full-Plan Earnings clause provides that "incentive payments are earned under the Plan terms, and are no longer considered Plan-to-Date advance payments, only after the measurement of complete business results following the end of the full-Plan period . . . ." (Doc. 51-6 at 4.) Further, it provides, "[i]ncentive payments will be considered earned only if you have met all payment requirements . . . and the customer has paid the billing for the sales or services transaction related to your incentive achievement."[10]   (Id. at 4-5.)   IBM contends that "measurement of complete business results" includes consideration of the Significant Transaction review, and therefore Stephenson's commissions had yet to be "earned."   Stephenson disagrees, contending that the IPL does not support that construction, and,

---

[10] IBM does not contend that any other aspect of the clause, which relates to contingencies such as early termination or employee misconduct, applies here.

19

in any event, IBM's witnesses testified differently.  For example, IBM conceded that "complete business results" was the same as "achievement results," which are simply the amounts the salesperson sold.  (Doc. 51-5 at 94:12-96:9, 133:15-135:7, 146:12-147:5, 209:7-9.)   And while company witnesses considered commissions "earned" when the work was invoiced (Doc. 51-5 at 30:4-33:1) -- which differs from the terms of the IPL -- IBM invoiced BB&T on June 30, 2015, and the invoice was paid July 29, 2015, almost three weeks before Stephenson's commissions were capped. (Docs. 51-5 at 138:7-139:12; 51-29; 51-32.)   LabCorp signed its contract June 30, 2015, although no invoice was produced despite Stephenson's request.  (Docs. 51-5 at 139:13-140:13; 51-33.)  At a minimum, the standard of "measurement of complete business results" for determining whether commissions were "earned" under the IPL is ambiguous and subject to a factfinder determination. Moreover, IBM has not demonstrated that it had not yet been paid by both clients when it reduced Stephenson's commissions.  Because an issue of material fact exists, the court therefore cannot conclude as a matter of law that IBM had the discretion to modify or withdraw the IPL as to the commissions at issue.

In contrast to the Right to Modify or Cancel clause, which addresses IBM's right to modify or cancel the IPL before a payment is "earned," the Significant Transactions clause gives IBM discretion to adjust commission payments on "significant

20

transactions" at any time, regardless of whether the commissions are "earned." See Schwarzkopf v. Int'l Bus. Machs. Corp., No. C. 08-2715 JF, 2010 WL 1929625, at *9 (N.D. Cal. May 12, 2010) ("The more restrictive language . . . may prevent IBM from modifying the terms of the incentive plan once a salesperson 'earns' commission by completing a sale . . . . At the same time, the Significant Transaction clause appears to allow incentive payments that are disproportionate . . . to be reviewed and adjusted at any point, including after the commission is 'earned' by completion of the sale."); cf. Vinson, 2018 WL 4608250, at *7. The Significant Transaction clause has been the focus of IBM's defense at this stage. Whether the clause renders any reliance on the "capping" representations unreasonable depends on whether IBM in fact properly followed the terms of the clause in Stephenson's case. If so, IBM is correct that Stephenson could not have reasonably relied upon the statements in the PowerPoint, since the Significant Transactions clause allows for the reduction of commissions.

However, for the reasons already set forth, the court has found that whether IBM properly followed the terms of the clause is a disputed issue. If a jury were to conclude that IBM did not apply the relative contribution test of the Significant Transactions clause but rather applied an arbitrary E/R ratio to Stephenson's commissions, it could also reasonably conclude that Stephenson, in pursuing the BB&T and LabCorp deals to fruition,

21

reasonably relied on the "uncapped" representations in the PowerPoint.

At the hearing on the present motion, IBM changed tack and argued for the first time that its reduction of Stephenson's commissions was justified under the first prong of the Significant Transaction clause, which grants IBM discretion to reduce a commission it determines is "disproportionate when compared with the territory opportunity anticipated during account planning and used for the setting of any sales objectives." (Doc. 51-6 at 5.) According to IBM, the phrase "territory opportunity," which is not defined in the IPL, means "quota." Thus construed, IBM argued, the IPL put Stephenson on notice that the company could reduce his commissions when it determined they were larger than it anticipated when his quota was set. According to IBM, the BB&T and LabCorp deals greatly exceeded Stephenson's quota and he should have known his commissions were subject to reduction under this prong.

IBM's new argument faces two significant difficulties. First, it is procedurally improper, as it was not raised in the briefs, thus depriving Stephenson of a fair opportunity to address it. For this reason alone, it should not be considered at this time. N.C. All. for Transp. Reform, Inc. v. U.S. Dep't of Transp., 713 F. Supp. 2d 491, 510 (M.D.N.C. 2010) ("Raising such new arguments for the first time at oral argument undermines the purpose of orderly briefing and risks subjecting an opponent to an

22

unfair disadvantage.").

Second, even if the court were to consider the argument, the record is simply not developed on the question of whether IBM invoked the first prong when reducing Stephenson's commissions. To the extent they relied on the IPL, IBM's own witness testified that the <u>second</u> prong, and not the first prong, formed the basis for their reduction. (Doc. 51-5 at 183:3–7.)

Moreover, notwithstanding IBM's urging and as Stephenson contends, the phrase "territory opportunity" is neither defined in the IPL nor readily apparent as meaning "quota."[11]   Under North Carolina law, "the purport of a written instrument is to be gathered from its four corners, and the four corners are to be ascertained from the language used in the instrument." <u>Lynn v. Lynn</u>, 689 S.E.2d 198, 205 (N.C. Ct. App. 2010) (quoting <u>Carolina Power & Light Co. v. Bowman</u>, 51 S.E.2d 191, 199 (1949) (Stacy, C.J., dissenting)).   When the terms within a document are clear and unambiguous, the court must enforce the terms as they are written.   <u>State v. Phillip Morris USA Inc.</u>, 685 S.E.2d 85, 90–91 (N.C. 2009).   An ambiguity exists, however, when the meaning of words is either uncertain or capable of several reasonable interpretations.   <u>Schenkel & Shultz, Inc. v. Hermon F. Fox &</u>

---

[11] "Quota" refers to a dollar amount in sales that an IBM salesperson is responsible for making before starting to earn commissions. (Doc. 51-1 at 43:7–44:10.)

23

<u>Assocs., P.C.</u>, 658 S.E.2d 918, 921 (N.C. 2008) (quoting <u>Register v. White</u>, 599 S.E.2d 549, 553 (N.C. 2004)).[12]

IBM has presented no evidence that the parties understood "territory opportunity" to mean "quota." The IPL defines the phrase "territory detail" as "a summary of [Stephenson's] territory as provided by [his] manager," and further states that "[m]easurement of your territory achievement is based on the territory measurement codes in the 'territory details' section." (Doc. 51-6.) Additionally, the term "territory description" in the IPL apparently refers to different "quotas" for the "Carolina's accounts." (<u>Id.</u>) It is unclear from the face of the document if these terms -- "territory detail," "territory achievement," and "territory description" -- are synonymous with, or distinct from, "territory opportunity." Even then, it is unclear if the term refers to a geographic territory, such as the Mid-Atlantic sales region, or a quota as IBM argues, or the products Stephenson was expected to sell.

For all these reasons, the court is constrained from concluding that Stephenson should have known his commissions were subject to arbitrary reduction under the first prong of the Significant Transaction clause. Because issues of material fact

---

[12] Although these cited cases involve contract interpretation and here the parties agree the IPL is not a contract, the cases are relevant because the terms of a written instrument are interpreted under the same standard. <u>See</u> <u>Howland v. Stitzer</u>, 84 S.E.2d 167, 172 (N.C. 1954).

24

preclude the court from finding that IBM is entitled to judgment as a matter of law on Stephenson's fraudulent misrepresentation claim, IBM's motion as to that claim will be denied.

**B.   Negligent Misrepresentation**

Under North Carolina law, a negligent misrepresentation claim requires a showing that a plaintiff (1) justifiably relied (2) to his detriment (3) on "information prepared without reasonable care" (4) by the defendant who owed the plaintiff a duty of care. Simms v. Prudential Life Ins. Co. of Am., 537 S.E.2d 237, 240 (N.C. Ct. App. 2000).

IBM argues that (1) Stephenson did not justifiably rely on the "uncapped" representations in the PowerPoint and (2) that he was not denied the opportunity to exercise reasonable diligence to fully inspect the information available to him regarding commission payments.

The justifiable reliance prong of a negligent misrepresentation claim is analogous to the reasonable reliance prong in a fraudulent misrepresentation analysis. Dallaire v. Bank of Am., N.A., 760 S.E. 2d 263, 267 (N.C. 2014). Thus, the court's analysis as to the fraud claim applies equally here. For the reasons noted as to the prior discussion of reasonable reliance, the court finds that an issue of material fact exists whether Stephenson justifiably relied on IBM's alleged negligent representations.

25

IBM's argument that Stephenson was not denied the opportunity to fully inspect the documents addressing his commission payments is unavailing. Stephenson has presented evidence that IBM did not apply the second prong of the Significant Transactions clause but rather applied an arbitrary reduction in his BB&T and LabCorp commissions. And, as to the first prong, it is not properly before the court. Thus construed, IBM has not demonstrated that a full inspection of the relevant documents would have helped Stephenson because he has presented evidence that IBM did not follow the terms of those very documents.

For these reasons, IBM's motion for summary judgment as to Stephenson's negligent misrepresentation claim will be denied.

### C.   Unjust Enrichment/Quantum Meruit

To this point, the parties have treated Stephenson's unjust enrichment and quantum meruit claims as subject to the same standard of proof.[13]   To be sure, some courts in North Carolina have comingled the two theories. See, e.g., TSC Research, LLC v. Bayer Chems. Corp., 552 F. Supp. 2d 534, 540 (M.D.N.C. 2008) (noting that unjust enrichment and quantum meruit are identical claims). Other courts have found them to be distinct causes of action. See, e.g., Elite Outsourcing Grp., Inc. v. Healthsouth Corp., 1:05CV00051, 2006 WL 1666739, at *1-2 (M.D.N.C. June 9,

---

[13] This court did the same in Vinson, upon the parties' concession. Vinson, 2018 WL 4608250, at *6 n.6.

26

2006) (stating that a claim for unjust enrichment is "similar" to but distinct from a claim for quantum meruit).  Under this latter view, a claim for quantum meruit requires proof that the services were (1) rendered to the defendant; (2) knowingly and voluntarily accepted; and (3) not given gratuitously.  Id. (quoting Volumetrics Med. Imaging, Inc. v. ATL Ultrasound, Inc., 243 F. Supp. 2d 386, 412 (M.D.N.C. 2003)).  And a claim for unjust enrichment requires proof that "property or benefits were conferred on a defendant under circumstances which give rise to a legal or equitable obligation on the part of the defendant to account for the benefits received."  Id. at *2 (internal quotations omitted).  What seems to confuse the matter is that other courts have defined unjust enrichment to require proof that a plaintiff (1) conferred a benefit on another, (2) the other party consciously accepted the benefit, and (3) the benefit was not conferred gratuitously, Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp., 351 F. Supp. 2d 436, 446 (M.D.N.C. 2005) (citing Se. Shelter Corp. v. BTU, Inc., 572 S.E.2d 200, 206 (N.C. Ct. App. 2002)), which mirrors the quantum meruit claim.

The Supreme Court of North Carolina has recently stated that "[t]he general rule of unjust enrichment is that where services are rendered and expenditures made by one party to or for the benefit of another, without an express contract to pay, the law will imply a promise to pay a fair compensation therefor."  Kraweic

27

v. Manly, 811 S.E.2d 542, 551-52 (N.C. 2018) (citations omitted).
The claim sounds neither in tort nor in contract.  Id.  "[T]he
measure of damages for unjust enrichment is the reasonable value
of the goods and services to the defendant." Booe v. Shadrick,
369 S.E.2d 554, 556 (N.C. 1988).  This description hews closely
with what the court said 20 years ago, when it said that "[q]uantum
meruit is a measure of recovery for the reasonable value of
services rendered in order to prevent unjust enrichment."
Whitfield v. Gilchrist, 497 S.E.2d 412, 414-15 (N.C. 1998).  This
court has read North Carolina law to treat unjust enrichment as a
cause of action, with quantum meruit as a measure of recovery.
See Sullivan v. Lab. Corp. of Am. Holdings, 1:17cv193, 2018 WL
1586471, at *7 (M.D.N.C. Mar. 28, 2018).  In any event, where
parties have sought relief under a cause of action labeled quantum
meruit, the Supreme Court of North Carolina has allowed the claim
but treated it as a remedy or measure of recovery.  See Ron Medlin
Constr. v. Harris, 704 S.E.2d 486, 489 (N.C. 2010); Potter v.
Homestead Pres. Ass'n, 412 S.E.2d 1, 7 (N.C. 1992).

Whether Stephenson's claim is most properly one for unjust
enrichment, with quantum meruit functioning as the equitable
remedial measure, need not be resolved now.  That is because IBM
has not founded its motion for summary judgment on any distinction

28

between the two theories.[14]   It suffices at this stage that the court finds that IBM has failed to demonstrate the absence of a genuine issue of material fact as to either.

Here, the court has found that the IPL is not a contract, as it contains an explicit disclaimer that "[t]he Plan does not constitute an express or implied contract . . . ."  (Doc. 51-6.) IBM argues that in North Carolina, a defendant is not unjustly enriched when a plaintiff performs a job for which he receives a base salary separate from incentive payments.   IBM relies on a line of cases, such as McCabe v. Abbott Laboratories, Incorporated, 47 F. Supp. 3d 339, 349 (E.D.N.C. 2014), that reject unjust enrichment claims where an employee is salaried and the employer retains discretion over any bonus compensation.    Because Stephenson was paid a base salary separate from his commission payment plan, IBM argues, his salary constituted a reasonable value for the services he rendered unto IBM.   Stephenson argues that such cases do not apply where the employer's discretion to pay commissions is constrained.

The court agrees with Stephenson.   While Stephenson received a salary, that fact alone is insufficient to preclude a claim for

---

[14] In Fessler, the Fourth Circuit noted that, despite the parties' concession to treat both claims alike, recent Virginia law in fact treated them differently.   Fessler, 959 F.3d at 156-57 (noting that Virginia law applied quantum meruit where there was a request for services but no compensation discussed, whereas unjust enrichment applied in the absence of a request and limited the remedy to the benefit received).

29

unjust enrichment, as he argues he had a hybrid compensation system of salary and commissions.  Fessler, 959 F.3d at 159 n.14. Moreover, IBM has not demonstrated that its discretion to adjust his commissions was unlimited or, more precisely, that IBM acted within its discretion in reducing the commissions.  The court has found that if IBM applied the Significant Transactions clause, the company retained discretion to reduce Stephenson's commission, and IBM would be correct that Stephenson could not have had any expectation of payment.  But, as the court has also found, there is a dispute of material fact whether IBM applied that clause in reducing Stephenson's commissions.  Because IBM represented to Stephenson that its discretion to reduce commissions was limited by the terms of the Significant Transaction clause, and because Stephenson has produced evidence that IBM did not comply with those terms, Stephenson has demonstrated an issue of material fact whether IBM's representations as to how his commissions would be calculated, including the representations in the PowerPoint that the "payments" and "earnings opportunity" were "uncapped," created a reasonable expectation of payment (i.e., that the benefit was not given gratuitously).

The cases cited by IBM are not on point.  In them, the defendant either retained total discretion not to pay commissions, or correctly determined that the plaintiff had failed to qualify for commission payments.  See, e.g., McCabe, 47 F. Supp. 3d at 349

30

(finding that employer retained absolute discretion not to pay commissions); Dulaney v. Inmar, Inc., 725 S.E.2d 473, 2012 WL 1514746, at *4 (N.C. Ct. App. May 1, 2012) (finding that employee was not employed at the time commissions were paid, as required). As this court has previously found, when "an employer pays an employee a base salary with the possibility of commissions, but does not retain absolute discretion as to whether to pay the commission, an employee who has not been paid the full amount of commissions can state a claim for unjust enrichment" if the facts support an expectation of payment. Vinson, 2018 WL 4608250, at *7; see also Kornegay v. Aspen Asset Grp., LLC, No. 04-cvs-22242, 2006 WL 2787897, at *10 (N.C. Super. Ct. Sept. 26, 2006).

IBM directs the court's attention to other cases in which courts dismissed unjust enrichment claims by IBM salespeople and urges this court to adopt their reasoning to find that Stephenson could not have had a reasonable expectation of additional commissions. Two of these cases determined that state law precluded the plaintiffs' reliance since, under state law, the presence of disclaimers in the IPL rendered reliance unreasonable. See Middleton v. Int'l Bus. Machs. Corp., 1:18-cv-3724-LMM, 2019 U.S. Dist. LEXIS 61308, at *12, *15–16 (N.D. Ga. Jan. 2, 2019), aff'd 787 F. App'x 619 (11th Cir. 2019) (per curiam); see also Snyder v. Int'l Bus. Machs. Corp., No. 1:16-cv-03596-WMR, 2019 U.S. Dist. LEXIS 66583, at *14–16 (N.D. Ga. Mar. 18, 2019) (citing

31

Middleton's reliance on Georgia law in dismissing Plaintiff's unjust enrichment claim).

Middleton also did not squarely address the application of the Significant Transactions clause, as IBM did not exclusively rely on that clause in that case. Middleton, 2019 U.S. Dist. LEXIS 61308, at *12 n.3 ("[T]he significant transactions provision *may* be at issue in the present case.") (emphasis added). Snyder likewise held that the entirety of the IPL granted IBM complete discretion regarding commission payments, whereas here IBM has maintained that only the Significant Transactions clause formed the basis for its reduction of Stephenson's commissions. See Snyder, 2019 U.S. Dist. LEXIS 66583, at *13-16. Morris v. Int'l Bus. Machs. Corp., 1:18-cv-0042-LY, 2018 WL 7291382 (W.D. Tex. Nov. 29, 2018) is distinguishable because, under Texas law, a quantum meruit claim cannot apply to services covered by an agreement that provided for the plaintiff's salary. Id. at *3-4. Because the IPL in that case provided for the plaintiff's salary, his quantum meruit claim failed. As described above, however, this is not the law in North Carolina -- an employee may still bring an unjust enrichment claim when receiving a salary for services, provided that the employer does not retain full discretion to pay out commissions. The last case IBM cites found that IBM retained complete discretion to pay (or not to pay) plaintiff commissions at all. Fessler v. Int'l Bus. Machs. Corp.,

32

No. 1:18-cv-798, 2018 WL 6220209, at *5 (E.D. Va. Nov. 28, 2018).
However, the district court's decision has since been vacated on
this point and is therefore unavailing.  See Fessler, 959 F.3d at
158-59.  Thus, the cases cited by IBM are distinguishable and do
not persuade the court to change its reasoning.  IBM's motion for
summary judgment as to Stephenson's unjust enrichment/quantum
meruit claim will therefore be denied.

## III. CONCLUSION

For the reasons stated, Stephenson has demonstrated that
genuine issues of material fact exist as to his remaining claims.

IT IS THEREFORE ORDERED that IBM's motion for summary judgment
(Doc. 45) is DENIED.


                              /s/   Thomas D. Schroeder
                              United States District Judge

July 13, 2020

33